889 A.2d 445 (2006)
382 N.J. Super. 347
Glynn MOORE, Appellant,
v.
BOARD OF TRUSTEES OF the STATE POLICE RETIREMENT SYSTEM, Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted November 29, 2005.
Decided January 11, 2006.
*446 Nancy E. Whatley Griffin, Mount Holly, attorney for appellant.
Peter C. Harvey, Attorney General, attorney for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Marc Krefetz, Deputy Attorney General, on the brief).
Before Judges SKILLMAN, AXELRAD and PAYNE.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
The issue issue presented by this appeal is whether a psychic stimulus occurring in the course of public employment may constitute a "traumatic event" that would establish eligibility for an accidental disability pension. We conclude that only an accident that involves application of an external physical force may be found to constitute a "traumatic event," and therefore a disability caused by a purely psychic stimulus does not qualify for an accidental disability pension.
Appellant Glynn Moore, an African-American, was a State Trooper for fifteen years. Appellant was placed on medical leave for stress in May 1999. Appellant remained in this status until September 2002, when the Superintendent of the State Police notified him, after a medical evaluation, that he was mentally and physically incapacitated for the performance of his assigned duties and should submit an application for a disability retirement. Appellant then applied for retirement on an accidental disability pension based on his "prolonged exposure to a racially hostile work environment as a New Jersey State Trooper by being pervasively exposed to racial profiling." Appellant claimed that this racially hostile work environment had caused him to suffer post-traumatic stress disorder and other mental disabling consequences.
The Board of Trustees of the State Police Retirement System denied appellant's application on the ground that the incidents of racial harassment alleged in his supporting certification did not constitute "traumatic events" within the intent of N.J.S.A. 53:5A-10. The Board also concluded that appellant had not shown that his failure to file an application for an accidental disability pension within five years of the alleged "original traumatic event," as required by N.J.S.A. 53:5A-10, was due to a "delayed manifestation" of his disability. However, the Board determined that appellant was permanently and totally disabled from the performance of his assigned duties and consequently awarded him an ordinary disability pension.
Appellant requested a hearing to contest the denial of his application for an accidental disability pension, and the matter was referred to the Office of Administrative Law. The Administrative Law Judge (ALJ) to whom the case was assigned bifurcated the issue of whether there had been a "delayed manifestation" of appellant's disability and heard evidence solely on the question whether the racial harassment experienced by appellant constituted a "traumatic event."[1]
*447 At the hearing, appellant testified to numerous incidents of racial harassment, beginning shortly after his graduation from the State Police Academy in 1987. In his first assignment, appellant's supervisor referred to him as "boy," "black boot" and "ditty bobber" and described his clothing as "pimp clothes." When appellant complained to the station commander about this treatment, he was told to "get with the program or get the hell out." Other troopers poured water on appellant's hat and put it in a freezer, put salt in the pockets of his shirt and pants, and placed racist pictures and other items in his locker and squad box, including a Ku Klux Klan membership keychain.
In November 1988, appellant and his supervisor responded to a call regarding a disabled motorist. When they arrived at the scene, they found an African-American woman whose car had gone down an embankment. The woman was hysterical and smelled of alcohol. Appellant helped the motorist out of her car and took her up the embankment, after which the officers handcuffed her and attempted to place her in the back seat of the police car. As she was being placed in the car, the woman kicked one of the officers. Appellant's supervisor then jumped into the car and began beating the woman with his fists and a flashlight. A municipal police officer who had responded to the scene also struck the woman. As the officers were beating the woman, they referred to her as "black bitches." The beating was sufficiently severe to require the woman's hospitalization. When appellant complained to his sergeant about the excessive force used upon the woman, the sergeant said: "I better get my act together ... [,] ship up and get with the program[,] or I'm getting out of here, and he reminded me that I had less than five years on my tenure."
Appellant also testified that he was instructed and required to participate in racial profiling in which African-Americans, Hispanics and other minorities were stopped, questioned and searched without probable cause. The Caucasian officers referred to the African-Americans as "coons," "niggers" and "porch monkeys" and the Hispanics as "wetbacks" and "spics."
After appellant was transferred to another assignment in 1989, the pattern of racial harassment he had experienced in his first assignment continued. Racially derogatory materials were placed in his locker and squad box, and a tire on his personal car was slashed. Appellant's complaints to supervisors about this harassment were rebuffed.
Appellant was subjected to similar racial harassment in his subsequent assignments within the State Police. In late 1998, he was assigned to ride with another trooper who was notorious for engaging in racial profiling. This trooper would say, "Hey, we're going hunting tonight," or "We're going to wrestle up some cattle," which meant he planned to arrest and search African-Americans without probable cause. The trooper also would subject the African-Americans he stopped to various forms of intimidation and harassment and use racial epithets to degrade them. Appellant complained to his supervisors about this conduct, but was again rebuffed.
The Board did not present any evidence to contest appellant's allegations regarding the racial harassment he had experienced in the State Police.
*448 Based on the evidence presented at the hearing, the ALJ determined that none of the incidents described by appellant constituted a "traumatic event" within the intent of N.J.S.A. 53:5A-10. The ALJ concluded that "racial or sexual harassment over a lengthy period of time [cannot] constitute a traumatic event under the current definition." The ALJ also concluded that the 1988 incident in which appellant observed Caucasian officers beat an African-American woman did not constitute a traumatic event:
Petitioner was not in danger during the incident and nothing that occurred was aimed at him. If witnessing a beating satisfies the ["traumatic event"] standard then the door is open more widely in the psychological realm than it is for physical traumatic events.
The Board adopted the ALJ's recommended decision and reaffirmed its initial denial of appellant's application for an accidental disability pension and award of an ordinary disability pension. We affirm.
N.J.S.A. 53:5A-10 provides in pertinent part that a member of the State Police Retirement System may be retired on an accidental disability pension if the member is found to be "permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties." The same statutory standard for an award of an accidental disability pension also governs the other state pension funds. N.J.S.A. 43:15A-43 (Public Employees' Retirement System); N.J.S.A. 43:16A-7 (Police and Firemen's Retirement System); N.J.S.A. 18A:66-39 (Teachers' Pension and Annuity Fund).
A member of the State Police Retirement System who retires on an accidental disability pension is entitled to receive two-thirds of his or her final compensation as a retirement allowance. N.J.S.A. 53:5A-10(b). A member who does not qualify for an accidental disability pension may retire on an ordinary disability pension, the amount of which is based on years of creditable service, subject to a minimum of 40% of final compensation. N.J.S.A. 53:5A-9(b).
The current standard for the award of an accidental disability pension was adopted in the mid-1960s by amendments to the statutes governing the state pension funds. L. 1965, c. 89, § 10 (State Police), L. 1964, c. 241, § 4 (Police & Firemen's); L. 1966, c. 67, § 4 (Public Employees); L. 1966, c. 66, § 2 (Teachers). The intent of the Legislature in adopting this standard was "to make the granting of an accidental disability pension more difficult" than it had been under prior law. Cattani v. Bd. of Trs., Police & Firemen's Ret. Sys., 69 N.J. 578, 584-85, 355 A.2d 625 (1976).
Under this standard, "the statute uses `traumatic' to describe the event which results in a disabling injury, rather than the injury itself." Id. at 586, 355 A.2d 625. Since "[t]rauma has been defined as `a wound; any injury to the body caused by external violence[,]' [t]he phrase `traumatic event'would ordinarily involve a mishap or accident involving the application of some kind of external force to the body or the violent exposure of the body to some external force." Ibid. (citations omitted).
In Kane v. Bd. of Trs., Police & Firemen's Ret. Sys., 100 N.J. 651, 663, 498 A.2d 1252 (1985), the Court undertook "to bring clarification" to the meaning of "traumatic event." Initially, the Court reaffirmed its conclusion in Cattani that "the legislature intended that an accidental disability pension ought to be awarded [only] in cases ... in which the worker himself is exposed to a violent level of force or impact." Id. at 662, 498 A.2d 1252. The *449 Court then articulated the following tests for determining whether a work-related accident constituted a "traumatic event" that may qualify for an accidental disability pension:
[T]o be eligible for accidental disability retirement allowance, a worker must demonstrate (1) that his injuries were not induced by the stress or strain of the normal work effort; (2) that he met involuntarily with the object or matter that was the source or the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power.
[Id. at 663, 498 A.2d 1252.]
The Court also gave examples of accidents that could qualify for an accidental disability pension under these tests:
[A] fireman who is thrown off the roof of a building by a sudden explosion or a burst of flames suffers an injury that is not part of the strain of normal duty but rather is a consequence of an involuntary mishap involving considerable force and power. The same would be true of the fireman who is struck by a falling beam or who falls off the top step of a tall ladder.
[Ibid.]
Although the racial harassment and coerced participation in racial profiling appellant was subjected to as a State Trooper was highly offensive, it did not constitute a "traumatic event" or series of "traumatic events" within the intent of N.J.S.A. 53:5A-10, as interpreted in Cattani and Kane. The psychological torment appellant experienced did not involve "the application of some kind of external force to the body or the violent exposure of the body to some external force." Cattani, supra, 69 N.J. at 586, 355 A.2d 625. Notwithstanding the Court's statement in Cattani, that "a traumatic event may possibly be found in some situations which do not literally fall within the external force or violence concept but still might be regarded as having traumatic origin[,]" ibid., the Court's later decision in Kane precludes an interpretation of this statement that would authorize an award of an accidental disability pension for the purely psychic stimuli that appellant relied upon in support of his application. Kane limits the award of accidental disability pensions to cases in which "a worker involuntarily meets with a physical object or some other external matter and is victim of a great rush of force or power." 100 N.J. at 663, 498 A.2d 1252. Despite the offensiveness of the racial harassment experienced by appellant, it cannot reasonably be characterized as a "traumatic event" in which appellant "[met] with a physical object or some other external matter and [was a] victim of a great rush of force or power[.]"
We have held that the source of a disabling injury may be found to be "a great rush of force or uncontrollable power" even though there was no direct physical contact between an external object and the employee. In Esposito v. Police & Fireman's Ret. Sys., 358 N.J.Super. 112, 817 A.2d 340 (App.Div.2003), a police officer suffered a total and permanent injury to his knee as a result of jumping out of the way of a car that was speeding towards him at forty to forty-five miles per hour. In concluding that the officer's injury was caused by the great rush of force or power required by Kane, we noted that the officer clearly would have been entitled to an accidental disability pension if he had suffered his injuries as a result of being struck by the car and held that there was "no basis ... to reach a different conclusion because [the officer] jumped out of the way to avoid being struck, which perhaps could have caused him greater injury." Id. at 121, 817 A.2d 340.
*450 The facts in Angiola v. Bd. of Trs., Pub. Employees' Ret. Sys., 359 N.J.Super. 552, 821 A.2d 98 (App.Div.2003) were similar to those in Esposito. A car approaching a tollbooth went airborne and struck another automobile and the top of a tractor-trailer, before stopping a few inches in front of the tollbooth. Anticipating that the car was going to strike his tollbooth, the toll taker jumped to the rear of the booth and struck his back on the counter, suffering disabling injuries. Id. at 555, 821 A.2d 98. In holding that the toll taker was entitled to an accidental disability pension, we concluded that the airborne car heading directly towards him constituted a great rush of force or uncontrollable power and that "[w]hether [the toll taker] was struck by the [car] or injured himself while attempting to escape its path does not alter the nature of the event." Id. at 560, 821 A.2d 98.
Appellant's psychological disability was not caused by an external object comparable to the cars that caused the accidental disabilities involved in Esposito and Angiola. The events that caused appellant's disability were solely the offensive words and conduct of appellant's fellow troopers and superiors in the State Police. Although this racial harassment satisfied the first two tests established by Kane because it did not constitute merely "the stress or strain of the normal work effort" of a State Trooper and appellant was "involuntarily" subjected to such treatment, it did not involve appellant "meet[ing] with a physical object or some other external matter and [being a] victim of a great rush of force or power[.]" 100 N.J. at 663, 498 A.2d 1252. Therefore, the racial harassment experienced by appellant did not satisfy the third Kane test for determining the occurrence of a "traumatic event."
Nor did the 1988 incident in which appellant observed Caucasian officers beat an African-American motorist constitute a "traumatic event" within the intent of N.J.S.A. 53:5A-10. To qualify for an accidental disability pension under Kane, "the worker himself [must have been] exposed to a violent level of force or impact." 100 N.J. at 662, 498 A.2d 1252. Thus, if appellant had been the victim of the assault and suffered total and permanent physical or psychological disability as a direct result, he would have been eligible for an accidental disability pension. However, appellant's psychological reaction to an assault committed upon another person did not constitute a "traumatic event" under Kane.
It must be emphasized that the tests for an award of an accidental disability pension are not fault-based. It is the nature of the event causing the disability that determines whether a public employee is entitled to an accidental disability pension, not whether the event was the product of the employer's culpable conduct. See Kane, supra, 100 N.J. at 661-63, 498 A.2d 1252; Cattani, supra, 69 N.J. at 584-86, 355 A.2d 625. Consequently, if a mental disability caused by racial harassment could be found to satisfy the "great rush of force or uncontrollable power" requirement, the same conclusion would have to be reached in a case in which a state trooper suffered a mental disability as a result of some other extraordinarily stressful situation that did not involve any fault on the part of the employer, such as observing a horrific accident or crime scene or dealing for a prolonged period with the consequences of a natural disaster or terrorist attack.
Appellant's argument in support of his accidental disability claim relies heavily on Pushko v. Bd. of Trs. of Teachers' Pension & Annuity Fund, 208 N.J.Super. 141, 505 A.2d 154 (App.Div.1986), which was an appeal from the denial of an application for an accidental disability pension *451 by a physical education teacher who suffered a mental breakdown after experiencing three violent incidents at school. In the first two incidents, the teacher was assaulted by students, one of whom punched him in the mouth and struck him over the head with a cane and the other of whom punched him in the chest and threatened to get a gun and kill him. Id. at 142-43, 505 A.2d 154. In the third incident, the teacher encountered two boys who were engaged in a fistfight in a hallway. Id. at 143, 505 A.2d 154. The teacher broke up the fight by pushing one of the boys against the wall and starting to choke him. There was no physical assault upon the teacher during this incident.
Before Kane, the court held that the Cattani "external force or violence" test did not apply to an accidental disability pension claim based on emotional trauma and that the three incidents experienced by the teacher constituted traumatic events that qualified for an award of an accidental disability pension. Pushko v. Bd. of Trs. of Teachers' Pension & Annuity Fund, 202 N.J.Super. 98, 493 A.2d 1309 (App.Div.1985). After deciding Kane, the Supreme Court summarily remanded Pushko for reconsideration in light of Kane. Pushko v. Bd. of Trs. of Teachers' Pension & Annuity Fund, 102 N.J. 349, 508 A.2d 221 (1985).
On remand, the Board conceded that the two assaults upon the teacher constituted traumatic events under the Kane tests. 208 N.J.Super. at 144, 505 A.2d 154. Thus, the only question was whether the third incident satisfied those tests. Ibid. The court did not decide this question. Instead, it remanded the case to the Board for the presentation of additional psychiatric testimony and reconsideration in light of Kane. Id. at 145-46, 505 A.2d 154. The court's opinion suggested two alternative theories upon which the award of an accidental disability might be sustained on the remand.[2] First, the court indicated that the Board should consider "whether the totality of the events set in motion by [the teacher] coming upon the fight constituted a psychic stimulus of uncontrollable power." Id. at 146, 505 A.2d 154. Second, the court stated that because the third incident occurred only shortly after the second incident, the Board should "reconsider[] the causation question"  whether the third incident, "quite apart from its characterization as traumatic within the Kane redefinition, was not a contributing factor at all but rather a symptomatic manifestation of a disability already fixed as a result of the synergistic operation of the first two events." Ibid.
The second alternative theory that the court in Pushko suggested could sustain an accidental disability pension clearly has no applicability to this case because, apart from the racial harassment experienced by appellant, there was no prior traumatic event or events that could be determined to be the sole cause of his mental disability. Consequently, appellant relies upon the first theory, which is that "a psychic stimulus of uncontrollable power" could be found to satisfy the third Kane test. Id. at 146, 505 A.2d 154. However, for the reasons previously set forth in this opinion, we disagree with this suggested theory for finding the occurrence of a traumatic event and conclude that the third Kane test cannot be satisfied by a purely psychic stimulus.
Appellant's further argument that the denial of his application violated the Equal Protection Clauses of the United States and New Jersey Constitutions is clearly without merit because the pension statutes treat a mental disability that results *452 from racial harassment in the same manner as a mental disability that results from any other psychic stimulus. The fact that the Board awarded an accidental disability pension to a State Trooper for sexual harassment in 1997 does not compel the Board to continue awarding accidental disability pensions for racial or sexual harassment even though it now recognizes that such conduct does not constitute a traumatic event. An administrative agency has no obligation to follow a prior agency decision that incorrectly interprets a statute or Supreme Court opinion. See Glukowsky v. Equity One, Inc., 180 N.J. 49, 65-66, 848 A.2d 747 (2004); In Re Trantino, 89 N.J. 347, 364, 446 A.2d 104 (1982).
Finally, we note that the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, and Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000e-17, allow a public employee who has been subjected to racial harassment during the course of employment to seek money damages for emotional distress or other injury suffered as a result of that harassment.[3]See Taylor v. Metzger, 152 N.J. 490, 498-508, 706 A.2d 685 (1998)(LAD); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295, 301-03 (1993).
Affirmed.
NOTES
[1] To qualify for an accidental disability pension, a public employee also must show that his or her disability was a "direct result" of the traumatic event or events. N.J.S.A. 53:5A-10; see Gerba v. Pub. Employees' Ret. Sys., 83 N.J. 174, 184-89, 416 A.2d 314 (1980). It is unclear whether the ALJ deferred this issue, as well as the issue of "delayed manifestation," for future consideration if appellant was able to establish he had experienced a traumatic event or events. However, it is clear that if a purely psychic stimulus could qualify as a "traumatic event," an applicant for an accidental disability pension also would be required to show that his or her mental disability was a "direct result" of that event.
[2] There is no published record of the disposition on this remand.
[3] The record indicates that appellant brought a civil action based on the racial harassment to which he was subjected while a member of the State Police, but it does not indicate the nature of that action or its disposition.